Good morning. May it please the court. My name is Michelle Cain. My partner Dominic Plantemura and I are Boston College Law students. We are appearing under the supervision of Kari Hong. We represent petitioner Kelvin Melgar-Alas, whom we will refer to as Mr. Melgar. I will reserve two minutes for my partner and will watch my time. There are two ways to resolve this case, citizenship and CAT. On citizenship, the full court has accepted en banc review of Cheneau. To avoid the risk of removing a citizen, Mr. Melgar asks that the court wait to decide this case until the full court decides Cheneau. If Cheneau vacates Romero-Ruiz, Mr. Melgar will then meet all of the 1432 factors necessary to derive citizenship. The government doesn't contest Mr. Melgar's factual eligibility. Because only legal issues remain, this court has the authority to decide citizenship. However, if the court believes a factual dispute exists, the remedy is for the court to transfer to the district court. On CAT, there are two points. Okay, so Cheneau basically, that's an en banc case. So if it goes the way of the second circuit, that's, that's good for you. If it doesn't go the way, do you concede that under the, if it goes through, if the court goes back to, I think it was Romero or it's, if, if that, if that remains good law, do you lose on that citizenship argument? Yes, Your Honor, that's correct. Okay, so Cheneau, you have to, you've got to get, you've got to get Cheneau to go the way of the second circuit or you lose on that. So if you want to go on to, and so then you've got, he originally applied for what, asylum withholding and CAT, but he was, the court, I guess, this pretermitted and said his felony convictions knocked him out on asylum and withholding. So do you agree that he doesn't have a chance for asylum or withholding? He's got to prevail on CAT if we get to that? Yes, Your Honor, citizenship and CAT are the two issues we're raising in this case. Okay. And in terms of CAT, may I just, may I just be sure I understand, you are asking this court to defer submission pending the in-bank decision in Cheneau, is that correct? Yes, Your Honor, that's correct. So we are asking the court to wait to decide this case until Cheneau is decided. And turning to CAT, there are two points, individualized risk and acquiescence. On individualized risk, MS-13 wrote a note calling on gang members to tighten the screws on the bicycle, a reference to Mr. Melger's wheelchair. This note was a call to kill Mr. Melger because he is a snitch. The government argues that a 13-year-old threat is too remote to be taken seriously today. There are several reasons why they are wrong. First, this was an extremely serious threat. The LAPD knew the danger was credible enough and specific enough to immediately place Mr. Melger in protective custody. The only reason the LAPD took him out of protective custody is because they could not accommodate his wheelchair. Second... Okay, but so he got a 120-month sentence, right? And then he, on 120 months, so he was in the hole for over a month or something. And then is he out on the main line after that or he's in medical or something where, but he's still not, he's not in the hole, right? That's correct, Your Honor, that he was in protective custody for just about a month. But he was not in general population, the entirety of his sentence. From 2013 on, Mr. Melger was in medical units and not in the general prison population. Okay, so he, but nothing happened to him, right? And nothing's happened to him since, right? That's correct, Your Honor. The only threat was in 2008. But I would remind the court that Mr. Melger is not afraid that MS-13 will harm him in the United States because he has proof that the U.S. government, even when he was in jail, would and did protect him. But in El Salvador, he won't have that same protection. He identified, even after getting the threat, he still continued to identify as MS-13, didn't he? And he got more tattoos and he didn't really separate himself for some time, right? Mr. Melger left MS-13 while he was in prison many years ago. The exact date isn't in the record. And he did testify credibly that he left because they perceived him as a snitch. And he was found credible? He was found credible? Okay. And according to the federal government's own indictment, MS-13 has an ongoing reason to kill Mr. Melger. MS-13 leaders violently retaliate against opponents, including with murder, because they need to enforce their rules. So what evidence do you have? Ms. Cain, may I ask? I understand you're developing the occurrences in the American prison, but what is your evidence of past persecution in El Salvador? Your Honor, Mr. Melger did not experience torture in the past in El Salvador. He did fear future torture in El Salvador should he be returned at the hands of MS-13. What's your best evidence in the record supporting your argument that Salvadoran authorities will likely arrest and imprison the petitioner solely on the basis of his tattoos or other evidence of his past gang membership? Well, Your Honor, the court doesn't need to find that the Salvadoran will torture Mr. Melger because the Salvadoran government will acquiesce to MS-13's torture of him. And on MS-13's torture of him, MS-13 leaders violently retaliate against opponents in order to enforce their rules. That's from the federal government's own indictment. But what's your evidence in the record suggesting that gang members in El Salvador believe the petitioner cooperated with law enforcement in the U.S.? Do you have any evidence in the record of that? That MS-13 believes Mr. Melger cooperated? That gang members in El Salvador believe the petitioner cooperated with law enforcement? What's your evidence on that? Well, Your Honor, we do have evidence demonstrating that the danger is not confined to the United States. For example, the federal government itself notes that MS-13 is an international criminal organization with more than 35,000 members in El Salvador. We have record testimony that as soon as an MS-13 gang member is removed, the gang calls back to the United States to learn about him. The government's own wiretaps recorded Mr. Melger speaking to other gang leaders in El Salvador about gang business. We also know from Mr. Melger's testimony that some of his named co-defendants have been removed to El Salvador. And a United Nations report in the record corroborated the assertion that MS-13 has an ongoing reason to kill Mr. Melger. Once a gang targets an individual for retaliation, quote, the gravity of the threat does not diminish over time. In Rodriguez Molinaro, the Seventh Circuit rejected a similar remoteness claim made by government when it asserted that Mexican cartels must have lost interest in a drug dealer who had been imprisoned in the U.S. for seven years. There, the petitioner was in prison, the cartel was in Mexico, and the Seventh Circuit held that one could hardly expect the cartel to visit the petitioner in an American prison. And again, the fact that from 2013 on, Mr. Melger was in medical Rodriguez Molinaro. And turning to the issue... Oh, but he's out of custody now, right? Yes, Your Honor, he was released a few weeks ago. Okay. And turning to the issue of acquiescence, the government cites Del Cid Morroquin, which held that government efforts, even if ineffective, are enough to defeat acquiescence. But in June 2020, this court rejected that framework. Xochitl Jaime cited Madrigal because it explains that efficacy, not efforts, is the proper focus of the inquiry. Here, the BIA itself admitted that the Salvadoran government's fight against gangs, quote, may be slow, end quote. And under Madrigal, this admission is enough to prove that the Salvadoran government cannot currently protect Mr. Melger. And not only is the Salvadoran ineffective, it is complicit. People in government jobs are members of the same gang that wants to kill Mr. Melger. For example, mayors have hired gang members to be municipal employees. In parts of the country, gangs are the de facto government, setting up roadblocks and imposing their own law. MS-13 has financed mayors and local legislatures directly. And prison guards, instead of policing incarcerated gang leaders, are letting them conduct gang activities from their cells. The Salvadoran government isn't slow in fighting gangs because it lacks resources. It's slow because the Salvadoran government is complicit in MS-13's terror and control throughout the country. All right, well, the government's going to say otherwise, and your standard is to get this reversed. It has to compel that, correct? So what, in your view, is the government's best argument that, you know, MS-13 isn't under control here. It's not under control there. All right, but that doesn't mean that there's acquiescence. So what's the government's, what's your, what's the most difficult thing that you have to rebut from the government's perspective? What did they argue? Sorry. What did the government argue? The government, the government points to a line of cases like Del Cid, Morroquin, which seem to suggest that efforts are enough, regardless of how efficacious they are. And our best response, Your Honor, is that most recently, in June 2020, this court rejected that framework when it cited Madrigal, which held that efficacy, not efforts, is the proper focus of the inquiry. Do you have a case that says if you can't effectively control MS-13, that's acquiescence? Do you have a case that says that? Not that it says that exactly, Your Honor, but, for example, Madrigal v. Holder and Xochitl Jaime's v. Barr state that the BIA erred by focusing on the efforts and not on the ability of the country to combat cartel violence and drug violence. Okay, so those are your best cases? Yes, Your Honor. Okay. And if there are no further questions with leave of the court, may I reserve my remaining time? You may. If, are you giving it over to Mr. Plantemura? Sure, if that's all right with the court. All right. That's fine. Thank you. Is there any other questions? Okay. Since we have been talking about this for a while, you can add a minute on to Mr. Plantemura then, since you designated him to do the rebuttal. We'll give him your rebuttal any time that you have left. Okay. Thank you. All right. We'll hear from the government then. Good morning. Good morning, Your Honor. On behalf of Attorney General Merrick Garland. Can I just quickly ask you, if Cheneau comes out the way of the Second Circuit, I know that your initial briefs were before that en banc situation came about. Would you agree that he wins if Cheneau comes out that other way? Or what's your position on that? Because I'm not sure. She said what your position was, but I'm not sure I much from what you've said. Thank you so much for asking, Judge Callahan. So the government's position is that the case should definitely be stayed or deferred until there's a decision on Cheneau. If in fact, Cheneau upholds Romero Ruiz, then that issue was briefed in our case, and this court or this panel may issue a decision. If it turns out that the en banc panel finds out that besides that Romero Ruiz is not good law and decides to follow the Second Circuit, then I would still argue that petitioner is unable to show that he's derived citizenship. And this wasn't actually discussed in our briefs. And I'll be very, very succinct. But if the petitioner, I guess, was counsel for the petitioner overstating your position? Because I didn't see that. Slightly. Okay. Slightly. So if this court, if the Ninth Circuit does follow Nozuzu, then Nozuzu, relying on Ashton, another Second Circuit case, has ruled that it's the objective manifestation of intent to reside. And based on that, and that Second Circuit's discussion, it would be the filing of the 485. And in this case, Mr. Melgar-Alas did not file his 485, which is his application for LPR status, until March 11, 1998, when he would have been 18 years old and four months, which is over the statutory requirement. So former 1432 says it should have been, this intent should have been, should be prior to the applicant turning 18. And unfortunately, in petitioner's brief, they cite the date when Mr. Melgar-Alas signed the 485, not the date that it was actually filed. And that can be found on page 1108 of the record. The filing date is in the upper right-hand corner, and it says very clearly, March 11th. So if this Cheneau en banc panel decides to follow Nozuzu, and I would argue that Nozuzu talks about this objective manifestation, which is the filing, Mr. Melgar-Alas still would not be able to derive citizenship. If the en banc panel decides to follow some other, decides on some other role, then I would request supplemental briefing since the parties haven't had a chance to address that issue. I'm a little confused, just a little. Okay, so now you've clarified your position, and I didn't understand you have to completely conceded the issue. And that's why I wanted to know that. Okay, so if, if he had filed when he was 17, you would be comfortable with the fact that that would show his intent, and that we could decide the case. But you're saying he filed after he was 18, and we know that it wasn't granted until he was 21. So if he filed after, if he filed after he was 18, are there other ways that he can show the intent that don't involve the filing? So in Nozuzu, Your Honor, again, we unfortunately didn't have the opportunity to draft this or to include this in our, in our brief. But Nozuzu analyzes or considers the presence of family members in the U.S. that were also naturalizing or become LPRs. And in Nozuzu, the Second Circuit panel said that that was insufficient in and of itself to show this objective manifestation of intent. And in Nozuzu, the court says it has to be the filing. And yes, if the, if the panel decides that there's some other objective manifestation or decides to broaden that, then we would appreciate the opportunity to have some supplemental briefing or for the IJ or the agency to issue a decision on that. But in the first instance, you're saying there would be a factual dispute on that, possibly, that might have to be looked at, as opposed to, I mean, he's been here since he was 13 at 12. And then he got caught up in a gang shooting and ended up in a wheelchair in his teens. And then he's been to prison, he's had two convictions that pretermited the asylum and the withholding. That's correct, Your Honor. Okay, so let's, okay, I understand your position now. So on the cat, I think that counsel for the petitioner put out with their position. Why don't you say what your position is and why you think it doesn't compel their argument? Yes, Your Honor. So it's, I think the petitioner's arguments really paint a picture of this worst case scenario. And it overlooks or it forgets that the requirement for cat is linking these assumptions. It's a chain matter of JFF and other Ninth Circuit decisions explain that a grant of cat cannot be based on these chains of suppositions. And yes, the record might show that there is some communication or networking between gang members in the US and in El Salvador, which I might point out, much of those, the indictment, much of those conversations were about maybe sending a cell phone to someone in El Salvador, or Mr. Melgar-Alas says he was catching up with a childhood friend and talking about rap music. So the contents of that conversation weren't specific to any gang retaliation or snitches. So it doesn't shed any light per se on his claim of affair that MS-13 in El Salvador is more likely than not. But, you know, he cites to a number of articles in the record, but he not only petitioner's counsel mischaracterizes some of them, which I would like to point out to the panel. But also, like I said, forgets to also you know, explain that the record does show in fact, that El Salvadorian government has shown some effectiveness. And if I might point to the courts, for instance, in the US Department of State records at 402 in El Salvador, they created an internal affairs unit to investigate these criminal complaints against police officers. They created a disciplinary units to investigate administrative violations. At page 680 of the record, again, they talk about a decline actually in the number of gang members that have been killed by the state security forces. At 639 and 640 of the record, the same country report, they talk about the El Salvadorian government trying to target the gangs finances. And so they've created these other operations to target the finances to at page 526 and page 540 of the record. They also talk about different programs or collaborations between, for instance, the Guatemalan government and the El Salvadorian government to help tackle this violence. And they talk about a distinct drop in crime reduction in certain years, how deaths peaked at 103 deaths per 100,000 person in 2015, but they fell the next year. And so the record has numerous examples like this, and which are in our brief of soldiers or police officers who are being investigated for their participation in homicide, who've been dismissed, who've been put on administrative leave. There's an office of human rights ombudsman that was created, and the inspector general and the attorney general in El Salvador are also taking a role. So yes, I acknowledge that the record, it does look on its face, petitioner does point to what looks like what might, what El Salvador, it's not painting a rosy picture of El Salvador, but on the other side, the immigration judge and the board reviewed both that evidence that petitioner is pointing as well as the other evidence in the and looking at it found that petitioner hadn't met his burden to show that it was more likely than not. And I disagree that petitioner has shown that that evidence on that side versus all the other evidence in the record, which shows some efficacy and, you know, a lot of, again, showed the petitioner is very attenuated, very tenuous claim does not compel this court to find that he's eligible for protection. There's a couple of things I wanted to ask you about. One is, does the fact that he's a paraplegic in a wheelchair, does that factor in at all, making him more likely to be tortured or not? And then also, given that the IJ found the petitioner to be credible, why shouldn't we give the petitioner's testimony about his fear of being killed by members of his former gang controlling weight? So to your first question, your honor, petitioner does claim that part of his fear is based on his disability and that he will be noticed or more easily noticed in El Salvador. And that's his claim. And the IJ found that it was a credible claim. But going back to this linking of these assumptions, it is a very tenuous claim because he has to show, based on the record in this case, that that disability would make him more noticeable or would make him a target of some specific or particularized torture, which the government would then acquiesce in. And he hasn't shown that his disability would put him at that risk. Yes, just logically from this standpoint, and maybe at some of the work that I've done, when I see someone sitting in a wheelchair that's got gang tattoos, I pretty quickly jump to the fact that that's how that he ended up in the wheelchair because he was in a gang shooting. OK, that's and that's based on probably, you know, doing criminal trials as a lawyer for ten and a half years and another ten years, maybe as as a judge. So I mean, and I think ninety nine out of one hundred times I'd probably be right. You know, they have a teardrop and they're sitting in a wheelchair. I'm pretty sure that they had a gang shooting. Well, your honor, that might be that might be the case. But again, a cat in order to get cat protection, it's a very stringent standard. It's higher than asylum. It's higher for persecution because the whole aim of this of this convention is to offer protection to individuals who have a criminal background. And so that's why Mr. Melgar-Ellis can only get cat deferrals. He can't get withholding or any other type of protection. But at the same time, it's not it's not sufficient enough for him to say that I have a disability or I have a tattoo. He has to show that based on this record in El Salvador, he is more likely than not that he will be. And he may have submitted articles about deportees. I think it's in the brief a deportee who was killed, who had who had tattoos. But in that case, again, I would say the distinction and this is where I guess I'm maybe not doing a good enough job of saying the mischaracterization is in that case petitioner. That article doesn't refer to any retaliation or, you know, in terms of cooperation with law that article reports on the death being a some harassment by an arbitrary police officer. And that MS-13 deportee had a sleeve of tattoos, which is, you know, tattoos from his neck down to his wrist. In this case, Mr. Melgar-Ellis testified that he has two tattoos, which are in his upper right arm on the inside. So they're pretty discreet compared to the tattoos, you know, of of of individuals in those articles that he he's referenced. And yes. So are you distinguishing? I think that Petitioner's Council had to cited two cases as her best cases for her proposition. Are you distinguishing those cases? I would like to, Your Honor. So Chihuahua James, when I believe was one of the cases that Petitioner's Council relied on and in talking about acquiescence. And in that case, the Ninth Circuit found that there was a lot of acquiescence on the part of local police as well as national police. And in that case, the petitioner, I believe, had been raped. She'd been threatened at gunpoint with police officers, Mexican police officers nearby who laughed and did to protect her, which is is is not the accent we have here. And so there was a lot of collusion that the the sorry, in that case, the petitioner's boyfriend had paid Mexican police officers to arrest another romantic partner and put her in jail because of acts or events that were very similar, if not identical to Petitioner's claim. So that claim, I would say it's not the same because it wasn't as attenuated. It was a very direct or a stronger claim in the more likely than not standard. And then the other case, I apologize, I do not recall what it was, but I did want to make two other responses to Petitioner's point. The U.N. report that she refers to is basically an advisory opinion which discusses gang violence and the prevalence of gang violence across the world. It does mention, of course, the rise of crime or gangs in Central America, but it's a very general advisory type document. And also the reference to this de facto control in El Salvador. Actually, when you look at the record, a lot of those references are from articles that talk about countries in the Northern Triangle. That includes Honduras, El Salvador, and Guatemala. And the references, if I might, that are specific to El Salvador, Your Honor, actually show that whereas Guatemala and El Salvador had done these, you know, pain, they show the MS-13 charges candidates from different parties $100 to $1,000 to campaign in gang-controlled neighborhoods. The article very specifically says that that is not the case in El Salvador, that that is prevalent. Okay, and you're over time, so unless my colleagues have additional questions, we can clarify that for ourselves. They do not appear to. So thank you for your argument. Thank you, Your Honors. All right, we're going to go back to the appellant. And Mr. Plantemura, you have an I had asked your colleague what the government's position was on Cheneau and the LPR situation, because I had not seen it in the record. And it sounds like your colleague may have overstated what their position was. So I'd like you to respond to that first on that point. Yes, Your Honor, I'll respond to that. And then I have two following points. State your name for the record. Dominic Plantemura, Your Honor. Thank you. So on citizenship, the parties are in agreeance here that this court should wait to decide this case until Cheneau is decided. That's to avoid the risk of potentially deporting someone who could be a citizen in just a matter of weeks or months. But the government attorney misstated, however, is the date of filing is August 8, 1997, which is three months before Mr. Malgar turned 18. She misquoted the date as a March date that would have been after his 18th birthday. And so if Cheneau does follow the Ntozuzu rule, where filing the I-485 demonstrates an objective intent, Mr. Malgar meets all those same factors and can drive citizenship under that new rule. So for that reason, we would ask the court to wait until Cheneau is decided. Well, we'll look at it, but whether if you're both saying it. So you agree that it has to be filed before his 18th birthday. She says it wasn't, you say it was. Your Honor, that issue has not been addressed. It's not addressed in Ntozuzu and this court has not addressed it either. So if that issue is relevant, then we would ask to hold additional briefing on it. What does the record show? Was it filed before his 18th birthday? She says it wasn't. Between 1108 and 1111, the filing date was listed as August 8, 1997. Mr. Malgar turned 18 in October of that year. All right, well, that's something we can check. So when both of you state it with that kind of certainty, you better be, someone's not right here. Your Honor, moving on to my second two points. The government attorney claims that local efforts, excuse me, local corruption is not enough to show acquiescence by the government in El Salvador. However, the case Parada v. Sessions states that local officials is enough here. And not only do we have local corruption, we have national corruption through the police, as well as the I'd like to discuss that Mr. Malgar will be identified in El Salvador. In immigration court, federal government claims that Mr. Malgar would not be known to the gang members there and that no one in El Salvador will remember him or even want to harm him. However, in criminal court, the best evidence here, the government presented itself that Mr. Malgar was a gang leader. He has already identified him by his wheelchair, by calling him the snitch in the bicycle. They're going to tighten the screws on the bicycle. They know him as the snitch in the bicycle. With that in mind, the only reasonable conclusion here is that if Mr. Malgar is deported to El Salvador, as soon as he rolls off that plane, Mr. MS-13 is going to find him in his wheelchair and kill him. Why don't they kill him right here, though? Why are they waiting? Why don't they kill him right here? It's easier. Your Honor, as my partner mentioned, Mr. Malgar is not afraid of MS-13 harming him here in the United States. The United States has protective measures in place to combat gangs, and they even protected Mr. Malgar while he was in prison. El Salvador has no such protections for Mr. Malgar, and when he arrives in El Salvador, he will be in grave danger for the first time since the threat was made. But he's out of prison now, is he not? Are you sort of, uh, protective detail? He is out of prison right now, Your Honor. However, what has happened to Mr. Malgar in the past few weeks is not before this court. It was not before the BIA, and this court may only consider evidence in the record that the BIA relied on in making its finding. Yes, but you did say that he is, he's being protected in the United States by U.S. authorities. Did you not say that earlier? He was protected while he was in custody, Your Honor. My point is that in El Salvador, the gangs are running rampant. They're not running rampant. No, but he's no longer in custody. Are you saying that the protection has stopped in the U.S.? Yes, Your Honor. He's no longer in custody here in the U.S. He's no longer in custody, but is he still under some sort of protection? No, Your Honor. He's not under any official protection. All right. Thank you. All right. Thank you both for your argument. Unless either of my colleagues have additional questions, this matter will be submitted. All right. Thank you both, and the court will be in recess until tomorrow morning at 9 a.m.
judges: O'scannlain, Callahan, Fitzwater